Marie Anne GRAMLING, Plaintiff,

v.

Harry J. MORAVEK and Monica Moravek, Defendants.

No. 10627(2).

United States District Court
E. D. Missouri, E. D.

Sept. 30, 1957.

J. D. Wright, Davis, Hartsock & Wright, Indianapolis, Ind., Robert S. Allen, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for plaintiff.

Cleo V. Barnhart, St. Louis, Mo., for defendants.

HARPER, District Judge.

The plaintiff in this action, a citizen of Indiana, brought suit against her sister and her sister's husband, citizens of Missouri, for in excess of $18,000 which gives this court jurisdiction.

The plaintiff in this equity action seeks restitution for funds she expended in making improvements upon a 120 acre farm owned by the defendants in Missouri, and alleged losses sustained in the sale of her home in Indianapolis and moving expenses from Indianapolis to Gerald, Missouri, and back to Indianapolis, and seeks to have an equitable lien declared upon the land of the defendants for such expenditures and losses.

The testimony disclosed that the plaintiff is a widow some 76 years of age, who has lived in Indianapolis for the last 50 years except for the short time she spent at Gerald, Missouri; that for many years prior to the transaction in question she had not seen her sister, one of the defendants, except at their mother's funeral; and that she did not get along with her other relatives. In the fall of 1953 the defendant sister wrote to the plaintiff seeking to renew their friendship.

The plaintiff's relationships with her other relatives can probably best be illustrated by what she wrote in a letter to the defendant sister (Defendants' Exhibit G-1) in November, 1953, when she said: "I am very glad that you want to renew our friendship for I am lonely for no one cares if I live or die." Repeated reference is made in the letter to other members of the family with whom the plaintiff no longer gets along.

The plaintiff visited the defendants in late 1953, and while she had been a resident of Indianapolis for many years, she was impressed with the rural community in which the defendants lived and gave consideration to moving to that area to be near her sister. It was decided later by the plaintiff and the defendants that the defendants would permit the plaintiff to build a small house on the defendants' 120 acre farm near the defendants' home, which house was built and which is the basis for this lawsuit.

It is unfortunate that these sisters did not get along and pass their remaining days in peace, but as is so often the case such did not happen. The plaintiff would have the defendants reimburse her in this action for a purported loss in the sale of the duplex that she owned in Indianapolis, but her own testimony and the letters she wrote to her sister conclusively prove that there is not the least merit to any such contention, even if the defendants were liable in this action.

Plaintiff's testimony and the letters she wrote to her sister disclose that she received several thousands more for the house than it cost her in 1950. There is not one scintilla of testimony to the

effect that it was worth the amount for which it was listed and for which under her pleadings she would hold the defendants responsible. The testimony discloses that she was motivated in her sale of the property by the fact that Negroes were moving into the immediate area and that the first potential purchaser forfeited his escrow money as a result. While the plaintiff in her testimony stated that she did not know about the Negroes coming into the area until after she had sold the house, the letters she wrote to the defendants disclose that this is not true and that she did know about it.

In a letter she wrote defendants (Defendants' Exhibit G–10), postmarked February 17, 1954, she said:

"I had another buyer for the house look through it but they don't want to pay the price on account of the colored situation around here."

In another letter she wrote defendants (Defendants' Exhibit G–14), postmarked March 12, 1954, she says in referring to the house:

"The trouble is the colored question. One negro got within a block from here a few weeks ago, so everyone is hysterical over it and it will cut my price some."

Such is typical of much of the testimony of plaintiff. She would have the court believe one thing on direct examination, and yet when confronted with her own letters on cross-examination her answer would be, "I guess I wrote it if it's there in the letter."

With respect to the building of the house the plaintiff would have the court believe that it was the result of many promises made by the defendants and that until she was solicited by the defendants she had no intention of selling her house or of leaving Indianapolis. She testified that she had no idea about moving to Florida at any time, yet as is true with respect to the Negro situation, her letters again contradict her. In a letter written by the plaintiff to the defendants on January 14, 1954 (Defendants' Exhibit G–5), she says:

"I know that I must make a change here, either go in an apartment or to Florida or to you, but we must be very frank as to your approval and conditions involved, so when you write again tell me truthfully how things stand or how you and Harry see it and feel about it. I will not let it hurt our friendship."

On January 8, 1954, the defendants wrote a letter to the plaintiff (Plaintiff's Exhibit 3), in which the defendant sister said:

"He (referring to Harry) wants you to feel free to live your life as you wish, and we shall do the same. In other words, if people live so closely together they must respect each other's privacy and opinions, more so than when they are apart. I think that can easily be done, since we each have our own homes, and not sharing things and yet be close enough in case either need help.

"Before you will start building or spending any money here you should come down and have a contract drawn up for our mutual protection as we spoke of when you were here."

The testimony discloses that thereafter the plaintiff went to Gerald, Missouri, and a contract was prepared by attorneys before the house was built, the contract being dated February 4, 1954. The contract permitted the plaintiff to build the house on the 120 acre farm of the defendants, and at her death it would go to the defendants. She was granted the right and privilege of using, occupying and enjoying said dwelling, including right of ingress and egress to and from a public road for her natural life. The plans for the home were prepared by an architect in Indianapolis at the plaintiff's request, and before he prepared them he discussed the matter with the plaintiff as set out in Defendants' Exhibit G–10, a letter from the plaintiff to the defendants, postmarked Feb-

ruary 17, 1954, wherein the plaintiff had this to say:

"He (referring to architect) talked like a father to me. He asked how you will feel toward me if my house will look better than yours since mine will be new so I told him that you said that you will paint and fix it up just to satisfy him, then he ask if you and I were very congenial, so I told him you were a little spitfire, but it don't amount to anything, so he ask what kind of a disposition Harry has, so I told him Harry was (or is) from Bohemia, and true to his native country is more interested in peace and quiet, art and literature, then quarreling or social conventions, then he said, well, I am glad it is so, for you will have a better chance of getting along being so close together, so please, no offense meant in either direction, about the things I said to him. And Mrs. Birk came home on Thursday after I came home on Tuesday, she was very much upset about the whole affair."

The testimony and the letters of the plaintiff further disclose that one of her friends in Indianapolis tried to persuade her not to build the home and move to Gerald. The court can understand the warning of the architect and the plaintiff's friend in this regard, after having observed the plaintiff on the witness stand.

Under the plaintiff's own testimony, the representations made to her by the defendants were as follows: The plaintiff was to take her sister to church and to drive her elsewhere when the defendant sister's husband could not drive her. The defendants would look after the plaintiff's mail and shopping when she could not go to town. If the defendants were sick the plaintiff was to help the defendants, and vice versa. The plaintiff was a devout Catholic and her defendant sister was no longer active in the Catholic church, and the plaintiff testified that the main reason she went to Gerald was to get her sister to go to church. She would have the court believe that her dealings with the real estate people in the sale of her home were amicable, yet the letters she wrote to her sister conclusively show that such is not true, although she testified that she got along "wonderful" with the real estate people. She stated that she had her own car at Gerald, Missouri, after she had moved out there; that she came and went as she pleased and that the defendants did nothing for her, yet on the other hand she admitted on cross-examination that she never asked the defendants to help her. She made much ado about the fact that a neighbor pulled her out of a ditch one Sunday when she was stuck in the mud, yet there is no testimony to the effect that she advised the defendants that she was stuck or sought any help from them, or that they knew about her car being stuck.

While the plaintiff seeks to recover for fraudulent misrepresentations made to her, the proof does not support her petition. She was not forced to leave the home. The home is not now occupied and is available for her use. One needs but listen to the testimony of the plaintiff and read the letters that plaintiff wrote to the defendants which were offered in evidence, to come to the conclusion that it was inevitable that the plaintiff was not going to get along with anyone who lived as close to her as the defendants. This is a typical case of one older sister trying to dominate another sister, and after being unsuccessful suddenly becomes very disturbed and wronged. While it is unfortunate that such an arrangement was ever entered into, the plaintiff is not entitled to recover in this case and judgment will be for the defendants.

Attorneys for the defendants will prepare the findings of fact, conclusions of law and judgment to be entered by the court.